# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1488V

| | |
|---|---|
| JOHN MICHAEL DULANEY,<br><br>　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: August 3, 2023 |

*Bridget Candace McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Ronalda Elnetta Kosh, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On October 28, 2020, John Michael DuLaney filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus diphtheria acellular pertussis ("Tdap") vaccine received on August 13, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. Petitioner prevailed on entitlement and the parties negotiated damages, but proved unable to agree on an appropriate sum.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner is entitled to a damages award in the amount of **$120,000.00 for actual pain and suffering and $432.68 in actual unreimbursable expenses.**

## I.   Relevant Procedural History

This case was activated on November 12, 2020 (ECF No. 10). On April 29, 2022, Respondent filed a Rule 4(c) Report asserting that this case was not appropriate for compensation, because it was unclear when Petitioner's shoulder pain began (ECF No. 31). Following a status conference, on June 24, 2022, I issued findings of fact, determining that a preponderance of the evidence supported a finding that Petitioner's shoulder pain began within 24 hours of vaccination (ECF No. 32).

On July 25, 2022, Respondent filed an amended Rule 4(c) Report recognizing that my fact ruling is law of the case and agreeing that in light of the ruling, compensation is appropriate, despite his disagreement with my finding (ECF No. 34). Accordingly, on July 26, 2022, I issued a ruling on entitlement (ECF No. 35), and the parties commenced damages discussions.

Unfortunately, the parties soon reached an impasse in their discussions (ECF No. 39). Accordingly, on January 16, 2023, Petitioner filed a damages brief (ECF No. 42). Respondent filed a response on March 8, 2023 (ECF No. 43). The matter of damages is now ripe for resolution.

## II.   Relevant Medical History

On August 13, 2018, Petitioner, a pilot, received a Tdap vaccine in his left deltoid. Ex. 1 at 1. Twelve days later (August 25, 2018), he presented to the emergency department at Methodist and Childrens Hospital complaining of palpitations and irregular heartbeats. Ex. 2 at 21. He was found to be in atrial fibrillation with rapid ventricular response and was admitted. *Id.* While hospitalized, he reported that he had received a Tdap vaccine two weeks earlier in his left arm, and now was also having shoulder pain.[3] *Id.* at 35. Petitioner was treated for his heart condition and discharged from the hospital on August 26, 2018, and followed up concerning his cardiac health thereafter.

On October 25, 2018, Petitioner presented to his primary care physician ("PCP"), Dr. Victor Vela, complaining of left shoulder pain. Ex. 3 at 10-12. Petitioner reported that when he received the vaccine, "it felt funny and bubbly inside," and pointed to his mid

---

[3] The record indicated that he was having right shoulder pain (Ex. 2 at 35), but I have ruled that this was likely a typographical error. *Dulaney v. Sec'y of Health & Human Servs.*, No. 20-1488V, 2022 WL 2912668, at *4 n.3 (Fed. Cl. Spec. Mstr. June 24, 2022).

upper deltoid on the left side. *Id.* at 11. He added that one week after his Tdap vaccine, he "had fever and chills and [was] achy and sore all over." *Id.* He stated that there were certain left shoulder movements that caused sudden pain, and that his shoulder pain was getting worse compared to his September appointment. *Id.* On examination, he was tender to palpation over the left trapezius and deltoid muscles, without swelling or erythema. *Id.* at 12. Petitioner had normal left shoulder passive range of motion ("ROM") but abduction was painful. *Id.* Dr. Vela assessed Petitioner with an adverse reaction to a vaccine and recommended that he see a shoulder specialist, explaining that an injection can cause localized muscle and joint pain. *Id.*

On November 1, 2018, Petitioner was seen by orthopedist Dr. Casey Taber for left shoulder pain. Ex. 4 at 121. Petitioner reported that his pain "started in August after receiving an injection in his arm . . . . [t]his was a tetanus injection." *Id.* at 122. He reported that the pain worsened with reaching, and he felt weakness and popping. *Id.* It improved slightly with rest but otherwise had not improved. *Id.* at 122-23. On examination, Petitioner had positive Neer and Hawkins impingement results, slightly diminished internal rotation with pain, 170 degrees of forward flexion, and normal external rotation. *Id.* at 122. Dr. Taber diagnosed Petitioner with bursitis and arthritis, administered a steroid injection, and referred him to physical therapy. *Id.* at 123.

Petitioner underwent a physical therapy ("PT") evaluation on November 14, 2018. Ex. 5 at 61. The record indicates that Petitioner "received a tetanus/[diphtheria] vaccine in superior anterior shoulder and a week or so later was very sick while overseas" and was subsequently diagnosed with atrial fibrillation; Petitioner "attributes shoulder problem arising from injection in the wrong area and may have inflamed the bursa, vs intramuscular." Petitioner's pain was 0/10 at rest and 9/10 with activity, with a current pain level of 0/10. *Id.* On examination, his left shoulder active ROM was 132 degrees in flexion, 65 degrees in extension, 125 degrees in abduction, 85 degrees in external rotation, and 60 degrees in internal rotation. *Id.* at 62-63.[4] *Id.* His left shoulder exhibited reduced strength compared to his right shoulder. *Id.* at 63. He had positive impingement results on the Neer and Hawkins-Kennedy tests. *Id.* at 64. His signs and symptoms were consistent with left shoulder pain and bursitis with mild adhesive capsulitis. *Id.*

Petitioner returned to Dr. Vela on November 15, 2018, reporting that his shoulder felt a little better, but he still had decreased ROM. Ex. 3 at 8. Petitioner was advised to continue with PT and seeing an orthopedist, and that a repeat steroid injection may be needed. *Id.* at 10.

---

[4] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 50 to 60 degrees in extension, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, Measurement of Joint Motion: A guide to Goniometry 72, 76, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

Petitioner followed up with Dr. Taber on December 13, 2018. Ex. 4 at 118. He reported that the first steroid injection and PT had helped a lot, but he was still experiencing pain with certain motions. *Id.* at 120. Dr. Taber administered a second steroid injection, and directed Petitioner to continue PT. *Id.*

Petitioner was re-evaluated in PT on January 3, 2019. Ex. 5 at 74-81. His active ROM had improved slightly, but he still had positive impingement results. *Id.* He was assessed as having fair results in terms of intensity and frequency of pain with activities of daily living, but was still experiencing limited ROM. *Id.* He had not returned to cycling due to left shoulder pain. *Id.*

On January 24, 2019, Petitioner returned to Dr. Taber. Ex. 4 at 116. He reported that the two steroid injections had helped, but he continued to have pain and discomfort. *Id.* at 117. His current pain level was 5/10, and his pain worsened with overhead activities and reaching. *Id.* The pain was moderate in severity and dull and aching in nature. *Id.* PT had helped, but he experienced pain with certain motions during therapy. *Id.* On examination, his left shoulder was not tender, and his active ROM was 80 degrees in external rotation and 170 degrees in flexion. *Id.* He had positive Neer, Hawkins, and O'Brien's test results. *Id.* Dr. Taber noted that Petitioner's left shoulder pain had persisted after several months, two steroid injections, and PT, and recommended an MRI. *Id.* He noted that surgery may be warranted if the problem continued. *Id.*

Petitioner underwent a left shoulder MRI on February 1, 2019. Ex. 4 at 124. The MRI report documented moderately severe osteoarthritis of the acromioclavicular joint and "[a]t most mild subacromial bursal inflammation." *Id.* There was no intraarticular pathology of the glenohumeral joint, and the rotator cuff was intact and unremarkable. *Id.* There was "intramuscular edema in the deltoid which may be related to recent injection." *Id.* The report noted trace fluid in the glenohumeral joint without effusion. *Id.*

On February 6, 2019, Petitioner returned to Dr. Taber to review the MRI results. Ex. 4 at 113-115. Petitioner reported a pain level of 4/10. *Id.* at 115. He was still having problems with reaching overhead, and sometimes with sleeping. *Id.* On examination, his left shoulder active ROM was 170 degrees in forward flexion, normal external rotation, and slightly diminished internal rotation with pain. *Id.* Dr. Taber reviewed the MRI and noted that on the MRI the rotator cuff appeared fully intact, but that there was a bit of a signal change that could indicate a partial upper subscapularis tear. *Id.* He also observed edema surrounding the biceps. *Id.* There was effusion within the acromioclavicular joint, bone marrow edema, synovitis, and some bursitis. *Id.* Citing the AC joint arthritis, edema, bursitis, bicipital inflammation, and possibility of a small subscapularis tear, along with the

4

failure of extensive PT, anti-inflammatories, activity modifications, and two steroid injections, Dr. Taber discussed surgery with Petitioner. *Id.*

Petitioner attended a total of 12 PT appointments between November 13, 2018 and February 12, 2019. Ex. 5 at 61-86. Several months later, he followed up with Dr. Taber on June 20, 2019. Ex. 4 at 111. His pain had not resolved, and was worse with crossing his arms, reaching for a seatbelt, or reaching away from his body. *Id.* On examination, he exhibited tenderness to palpation in the bicipital groove. *Id.* at 113. His left shoulder active ROM was 80 degrees in external rotation and 170 degrees in flexion. *Id.* He continued to have positive results on the Neer, Hawkins, and O'Brien's tests. *Id.* Dr. Taber noted that Petitioner had failed eight months of conservative treatment, and shoulder surgery was planned. *Id.*

On October 16, 2019, Dr. Taber performed left shoulder arthroscopy with rotator cuff repair of the subscapularis, anterior labral repair, subacromial decompression and bursectomy, open subpectoralis biceps tenodesis, and distal clavicle excision. Ex. 5 at 6-7. Dr. Taber found that there was an upper subscapularis tear, in addition to significant bursitis and impingement. *Id.*

Petitioner's first postoperative follow up occurred on November 7, 2019, with physician assistant Timothy Stilwell. Ex. 4 at 104-106. Petitioner's shoulder incisions were healing without signs of infection. *Id.* at 106. His passive ROM in external rotation was 10 degrees. *Id.* Petitioner was directed to begin passive external rotation and table slides, and begin PT with passive ROM four weeks after his surgery and active ROM six weeks after surgery. *Id.*

On November 13, 2019, Petitioner underwent a PT evaluation. Ex. 5 at 8-15. He reported pain levels of 0/10 at rest, and 2/10 at present and with activity. *Id.* The record indicates that he reported a pain level of 5/10 at best; this is likely a typographical error, and probably should read 5/10 at *worst* rather than *best*. *Id.* His left shoulder active ROM was not tested. His passive ROM was 180 degrees in flexion, extension, scaption, and abduction, and 90 degrees in external and internal rotation. *Id.*

On December 10, 2019, Petitioner returned to Dr. Taber for another postoperative visit. Ex. 4 at 102. Petitioner's shoulder incisions were healed, with no signs of infection. *Id.* at 104. His passive ROM in external rotation was 25 degrees. *Id.* He was instructed to continue PT and start active ROM, with no strengthening for six more weeks. *Id.*

On January 9, 2020, Petitioner underwent a reevaluation in PT. Ex. 5 at 24-31. He reported pain levels between one and five out of ten, with dressing, reaching behind

5

his back, and end ranges of horizontal adduction and abduction being the most problematic. *Id.* at 24. His active ROM was measured at 125 degrees in flexion, 70 degrees in extension, 75 degrees in internal and external rotation, and 130 degrees in abduction. *Id.* at 26. Petitioner reported 75% improvement since starting PT. *Id.* at 27. While he had progressed in ROM, strength, and activity tolerance, he still lacked full active ROM in all planes and lacked shoulder stability for dynamic activities. *Id.* Further PT was recommended. *Id.*

Petitioner returned to Dr. Taber on February 4, 2020. Ex. 4 at 100. He was doing well, with a pain level of 1/10. *Id.* at 101. His ROM was good, but he had some tightness with internal and external rotation. *Id.* On examination, his left shoulder active ROM was 80 degrees in external rotation and 170 degrees in flexion, and he had negative impingement results. *Id.* at 102. Petitioner was advised to continue to work on ROM and strengthening, and follow up as needed. *Id.*

Petitioner's final PT session was on March 10, 2020. Ex. 5 at 60. He reported that he was happy with his continued progress through PT. *Id.* The physical therapist noted that he did well and demonstrated good shoulder and scapular stability. *Id.* The plan was to discharge him to a home exercise plan after his next visit. *Id.* Petitioner attended a total of 26 PT appointments between November 13, 2019 and March 10, 2020. Ex. 5 at 8-60.

### III.     Affidavit Evidence

Petitioner submitted two affidavits in support of his petition, Exhibits 8 and 10. He averred that the August 13, 2018 tetanus vaccine felt different than any other injection he has had. Ex. 10 at ¶ 2. It felt as though "bubbles" were being injected. *Id.* The next day, he experienced expected soreness. *Id.* at ¶ 4. By two days after vaccination, the pain increased considerably. *Id.* at ¶ 5. He stated that he is a professional pilot and had an international trip coming up and tried to put the pain out of his mind. *Id.* at ¶ 6. During the trip, he became ill, and when he returned he had heart problems. *Id.* at ¶¶ 7-8. Petitioner states that his vaccine injury has resulted in a complete upheaval to his health and life. Ex. 10 at ¶ 14.

### IV.     The Parties' Arguments

Petitioner proposes an award of $130,000.00 in pain and suffering. Petitioner's Brief in Support of Damages, filed Jan.16, 2023 (ECF No. 42) ("Br."). Respondent proposes an award of $100,000.00. Respondent's Response to Petitioner's Brief, filed Mar. 8, 2023 (ECF No. 43) ("Resp."). The parties agree that Petitioner suffered a moderate SIRVA. Br. at 8; Resp. at 8.

In support of his position, Petitioner cites *Wilson*, *Rafferty*, *Randazzo*, and *Dobbins*, featuring pain and suffering awards of $130,000.00, $127,500.00, $125,000.00, and $125,000.00, respectively.[5] Petitioner asserts that he initially attempted to treat with conservative modalities, including PT and steroid injections. Br. at 9. When these measures failed and his pain persisted, his orthopedist recommended surgery. *Id*. After surgery, Petitioner returned to PT and followed up with his orthopedist. *Id*. At his final orthopedic appointment in February 2020, Petitioner was doing well, had good ROM, and reported a pain level of 1/10. *Id*. Petitioner asserts that he experienced a moderate SIRVA that required surgical intervention, as did the petitioners in the cases he cites. *Id*.

Respondent distinguishes the facts of Petitioner's cases, and cites *Hall*, *Cates*, *Selling*, and *Shelton*, involving pain and suffering awards of $110,000.00, $108,000.00, $105,000.00, and $97,500.00, respectively.[6] Respondent acknowledges that the cases Petitioner cites involve similar treatment, but asserts that nonetheless Mr. DuLaney's SIRVA was less severe, and was "prolonged by delays in treatment." Resp. at 11. Respondent argues that Mr. DuLaney did not suffer from severe shoulder pain, a significant loss of ROM, or "continued pain that returned after he completed PT after his surgery." *Id*. at 10.

Respondent asserts that like the petitioners in *Hall*, *Cates*, and *Selling*, Mr. DuLaney reported shoulder pain shortly after vaccination and required additional treatment after surgery. Resp. at 12. However, unlike those petitioners, Mr. DuLaney did not seek treatment right away. *Id*. Rather, Petitioner delayed treatment for more than two months, and had two additional gaps in care that "prolonged his recovery." Resp. at 13. Respondent acknowledges that Mr. DuLaney attended more PT sessions, and received more steroid injections, than the petitioners in *Hall*, *Cates*, and *Selling*, but argues that Mr. DuLaney's pain was less severe and thus he did not require aggressive treatment. *Id*. Respondent asserts that if not for the delays in treatment, Mr. DuLaney likely would have recovered in the same timeframe as the petitioners in *Hall* and *Cates*, justifying a lower award. *Id*.

---

[5] *Wilson v. Sec'y of Health & Human Servs*., No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021); *Rafferty v. Sec'y of Health & Human Servs*., No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020); *Randazzo v. Sec'y of Health & Human Servs*., No. 18-1513V, 2021 WL 829572 (Fed. Cl. Spec. Mstr. Feb. 1, 2021); *Dobbins v. Sec'y of Health & Human Servs*., No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018).

[6] *Hall v. Sec'y of Health & Human Servs*., No. 19-1556V, 2022 WL 2196412 (Fed. Cl. Spec. Mstr. May 6, 2022); *Cates v. Sec'y of Health & Human Servs*., No. 18-0277V, 2020 WL 3751072 (Fed. Cl. Spec. Mstr. June 5, 2020); *Wilson v. Sec'y of Health & Human Servs*., No. 16-0588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019); *Shelton v. Sec'y of Health & Human Servs*., No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

### V.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[7] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell.  For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## VI.   Prior SIRVA Compensation Within SPU[8]

### A.   Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[9] In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[10] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters

---

[8] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[9] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[10] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

9

themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[11]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[12] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 173 | 1,632 | 29 | 1,377 |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[13]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only

---

[11] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[12] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[13] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VII.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Petitioner's injury continued for nearly 19 months. I previously found that the onset of his pain occurred within 48 hours of the August 2018 vaccination, and he continued treatment until March 2020. Within less than four months (in December 2018), he reported an improvement in his shoulder pain.

His ROM deficits were in the mild to moderate range, and after surgery and PT improved greatly, although some deficits with overhead reaching and strength remained. In the early months of treatment, he reported severe pain with activity, but after a few

Case 1:20-vv-01488-UNJ   Document 48   Filed 09/05/23   Page 12 of 13

months of treatment and PT his pain levels remained mild to moderate. Overall, this was a moderate SIRVA, albeit one occurring in the context of a surgery.

*Randazzo* is the best comparable case offered by either side. Mr. DuLaney and the petitioner in *Randazzo* had similar injuries and treatment. Both had moderate injuries treated with steroid injections, PT, and surgery, and both had good outcomes. The petitioner in *Randazzo* sought care sooner and had slightly more intense pain, but one less steroid injection and less PT. Mr. DuLaney obtained some relief from early conservative care and thus the intense period of his pain abated sooner, although the overall duration of his injury was longer. As I indicated in the June 24, 2022 fact ruling, Petitioner's delay in seeking treatment suggests a less severe injury, and thus justifies a slightly lower damages award. *DuLaney*, 2022 WL 2912668, at *4. Respondent's comparables were less on point with respect to duration of injury or character of treatment – as Respondent acknowledges.

Respondent also emphasizes two four-month gaps in Petitioner's treatment (from February 12 to June 20, 2019, and June 20 to October 16, 2019), characterizing them as going "eight months with only one shoulder-related medical visit" and an "eight-month gap in treatment." Resp. at 8, 9. Treatment gaps are relevant to assessing pain and suffering, as they often suggest that a petitioner's condition could be tolerated without medical treatment. But not all gaps are created equal. It is not uncommon for a SIRVA petitioner to take a break from active treatment, in hopes that their condition will resolve on its own. And this record does not suggest, as Respondent speculates, that "it is likely that he would have recovered within the same timeframe as the petitioners in *Hall* and *Cates* if not for the delays in treatment." Resp. at 13.

Thus, although I give the initial delay in treatment some weight in assessing damages to be awarded, the subsequent gaps in this case do not similarly impact the result. And the total I am awarding is on the lower range of six-figure pain and suffering SIRVA awards in any event.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $120,000.00.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[14] **I also find that Petitioner**

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994))..

12

**is entitled to $432.68 in actual unreimbursable expenses.**[15]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $120,432.68, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[16]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master

---

[15] The parties are in agreement as to damages for unreimbursable expenses. Br. at 1; Resp. at 13.

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.